IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO

CARLOS L. ROSARIO RAMOS, *et al.*,

   **Plaintiffs**,

  v.

THE MUNICIPALITY OF RÍO GRANDE, *et al.*,

   **Defendants**.

CIV. NO. 18-1050 (JAG)

**OPINION AND ORDER**

Before the Court is Defendants' unopposed Motion for Summary Judgment. Docket No. 53. For the reasons below, the Court **GRANTS** the Motion for Summary Judgment, **DISMISSING** all federal claims **WITH PREJUDICE** and all state claims **WITHOUT PREJUDICE**.

**BACKGROUND**

On January 31, 2018, Carlos L. Rosario-Ramos ("Rosario-Ramos"), Ivelisse Rosario-Méndez ("Rosario-Méndez"), and Ricardo Torrens-Osorio ("Torrens-Osorio") (collectively, "Plaintiffs") filed this complaint against their employer, the Municipality of Río Grande ("Municipality"); Hon. Ángel B. González-Damudt ("Mayor"); Rey O. Caraballo-Rodríguez ("Caraballo-Rodríguez"); Leysla Ortiz-Sánchez ("Ortiz-Sánchez"); José A. Adorno-Aponte ("Adorno-Aponte"); and Evelyn González-Robles ("González-Robles") (collectively, "Defendants") in their official and personal capacities pursuant to 42 U.S.C. § 1983 for violations of their rights under the First Amendment of the United States Constitution.[1]

In sum, Rosario-Ramos and Rosario-Méndez allege that Defendants violated their First

---

[1] The complaint also includes pendent claims based on Puerto Rico's Public Service Personnel Act, P.R. LAWS ANN. Tit. 3, §§ 1301-1431; P.R. Law No. 131 of 1943, P.R. LAWS ANN. Tit 1, §§ 13-19; Puerto Rico's Employment Discrimination Act, P.R. LAWS ANN. Tit. 29, §§ 146 *et seq.*; and damages under Article 1802 of the Puerto Rico Civil Code, P.R. LAWS ANN. Tit. 31, § 5141, and the Constitution of Puerto Rico. Docket No. 33 at 9.

Amendment rights by discriminating and retaliating against them for making constitutionally protected public statements. Torrens-Osorio—Rosario-Méndez's spouse—claims First Amendment retaliation due to his wife's statements, as well as damages under Article 1802 for the persecution and discrimination that he purportedly suffered while working at the Municipality's Public Works Department. Plaintiffs request compensatory and punitive damages of no less than $300,000.00 for Rosario-Ramos, $300,000.00 for Rosario-Méndez, $50,000.00 for Torrens-Osorio, and $50,000.00 for the Torrens-Rosario conjugal partnership. Furthermore, they request equitable relief in the form of a permanent injunction ordering Defendants to reinstate Plaintiffs to their positions, as well as attorney's fees, costs, and expenses incurred.[2]

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure allows for summary judgment if "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "When the party who bears the burden of proof at trial is faced with a properly constituted summary judgment motion, defeating the motion depends on her ability to show that such a dispute exists." *Geshke v. Crocs, Inc.*, 740 F.3d 74, 77 (1st Cir. 2014) (citing *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)). But the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see Cherkaoui, v. City of Quincy*, 877 F.3d 14, 23-24 (1st Cir. 2017) (quoting *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)) ("Facts are material when they have the 'potential to affect the outcome of the suit under the applicable law.' A dispute is 'genuine' if 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party.'").

---

[2] On February 22, 2019, the Court dismissed Rosario-Ramos and Rosario-Méndez's claims for punitive damages against the Municipality, and all claims against co-Defendants Mayor González-Damudt, Caraballo-Rodríguez, Adorno-Aponte, and González-Robles in their official capacities. Docket No. 31.

Failure to timely oppose a motion for summary judgment does not, automatically, justify entry of summary judgment against that party; therefore, a court is "obliged to consider the motion on its merits, in light of the record as constituted, in order to determine whether judgment would legally be appropriate." *Kelly v. United States*, 924 F.2d 355, 358 (1st Cir. 1991) (citations omitted); *see De la Vega v. San Juan Star*, 377 F.3d 111, 115-16 (1st Cir. 2004). Nonetheless, "a party that fails to oppose a motion for summary judgment does so at its own risk and peril." *Quiñones Rodríguez v. Andoxx Corp.*, 440 F. Supp. 2d 77, 78 (D.P.R. 2006); *see also Corrada Betances v. Sea-Land Service, Inc.*, 248 F.3d 40, 43 (1st Cir. 2001). As a result, the court may deem as uncontested all evidence and facts presented with the unopposed motion. *Nieto–Vincenty v. Valledor*, 22 F. Supp. 3d 153, 161 (D.P.R. 2014). Thus, the moving party generally prevails. *Pérez–Cordero v. Wal–Mart P.R.*, 440 F.3d 531, 534 (1st Cir. 2006) ("While an unopposed summary judgment still must be scrutinized in accordance with Fed. R. Civ. P. 56 . . . [i]n most cases, a party's failure to oppose summary judgment is fatal to its case.").

## FINDINGS OF FACT

After carefully reviewing Defendants' unopposed Motion for Summary Judgment, Docket No. 53, and Statement of Uncontested Facts ("DSUMF"), Docket No. 53-1, as well as its supporting exhibits, the Court adopts Defendants' factual narrative by reference and deems it undisputed.[3] Although the most relevant material facts are included in the forthcoming discussion, the Court will first provide a brief summary of each Plaintiff's allegations.

Plaintiff Rosario-Ramos worked as a heavy equipment driver from 2009 to January 31, 2017 under a temporary employment contract renewed every certain amount of time. DSUMF ¶¶ 181-89.

---

[3] On January 31, 2020, the Court deemed the Motion for Summary Judgment and the Statement of Uncontested Facts as unopposed because Plaintiffs failed to timely respond—despite being warned of the consequences of not doing so. *See* Docket Nos. 57 and 68.

He had documented attendance issues prior to September 2016, and he was publicly affiliated with the Popular Democratic Party, the Mayor's party. *Id.* at ¶¶ 226-33. On September 22, 2016, per the reading of a report filed with the police on that same day, Rosario-Ramos was involved in a physical altercation with his supervisor, Caraballo-Rodríguez. *Id.* at ¶¶ 342-50. On September 25, 2016, he posted the following on the social media website Facebook: "Populares de Rio Grande with David Acosta" (which translates to "Popular Party Members with David Acosta", who is the Mayor's political opponent). *Id.* at ¶¶ 192-201. On September 26, 2016, Caraballo-Rodríguez asked Rosario-Ramos to sign an OP-13 form to exhaust his compensatory balance. Rosario-Ramos's contract ran until December 31, 2016 and it was renewed by the Municipality twice during January 2017, months after the post. *Id.* at ¶¶ 224-40. On January 31, 2017, after the extensions ended, his contract was not renewed due to the attendance issues that traced back to months prior to the post. *Id.* at ¶¶ 235-36.

Plaintiff Rosario-Méndez, who was also under a temporary employment contract, worked as a Purchaser for the Municipality since July 19, 2013. *Id.* at ¶¶ 3-5. She verified auctions and price quotes, and kept records of orders for materials. *Id.* at ¶¶ 5-7. Defendant Adorno-Aponte was her supervisor at all pertinent times. *Id.* at ¶¶ 25, 27. On October 2016, Rosario-Méndez talked to a reporter named José "Cheo" Cruz regarding what she suspected were illegalities in several transactions she handled. *Id.* at ¶¶ 92-99. Rosario-Méndez's contract was renewed monthly from January 2017 until September 2017. *Id.* at ¶¶ 164-74. On October 24, 2017, her contract was not renewed due to attendance and job abandonment issues. *Id.* at ¶¶ 34-42; ¶¶ 164-74.

Plaintiff Torrens-Osorio works as a heavy truck driver for the Municipality since April 2006. *Id.* at ¶¶ 241-246. His position is permanent, and he is married to Rosario-Méndez. *Id.* His only allegation against Defendants is that the Municipality engaged in reprisal against him as a result of

his wife's expressions to José "Cheo" Cruz. *Id.* Specifically, that the Mayor ordered a "demeaning campaign" against him and banned him from driving his truck. *Id.*

## DISCUSSION

### I. Section 1983

Section 1983 of the Civil Rights Act of 1866, 42 U.S.C. § 1983, "provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924 (1982) (quotation marks omitted). Here, Plaintiffs bring their § 1983 suit under the First Amendment, which "insulates public employees who hold nonpolicymaking positions from the vicissitudes of personnel decisions rooted in partisan political concerns." *Bergeron v. Cabral*, 560 F.3d 1, 7 (1st Cir. 2009) (*abrogated on other grounds by Reyes-Orta v. P.R. Highway and Transp. Auth.*, 811 F.3d 67 (1st Cir. 2016)); *see also Welch v. Ciampa*, 542 F.3d 927, 938 (1st Cir. 2008) ("[T]he First Amendment also prohibits government officials from taking adverse employment action against a non-policymaking government employee based on the employee's political affiliation . . . .").

As a threshold matter, Plaintiffs did not place this Court in a position to believe a reasonable juror would conclude that "a particular defendant's conduct caused the deprivation of a constitutional right." *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 902 (1st Cir. 1998). Less so when the record contains little or no evidence suggesting a causal nexus between Plaintiffs' political affiliation or expressions, and Defendants' conduct.[4] As such, the Court will proceed to discuss each Plaintiff's claims in turn.

---

[4] To the contrary, the uncontested facts and evidence attest otherwise. *See, e.g.*, DSUMF ¶¶ 139-41; 179-80; 203-04; 224; 339.

## II. Political Discrimination

"A plaintiff bringing a political discrimination claim under the First Amendment bears the burden of producing sufficient evidence from which a jury may infer that plaintiff's constitutionally protected conduct [or political affiliation] was a substantial or motivating factor behind the adverse employment action." *Torres-Rivera v. P.R. Elec. Power Auth.*, 598 F. Supp. 2d 250, 255-56 (D.P.R. 2009) (citing *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 28 (1st Cir. 2008)); *see also Rodríguez-Ríos v. Cordero*, 138 F.3d 22, 24 (1st Cir. 1998). To establish a *prima facie* case of political discrimination, one must show: "(1) the plaintiff and the defendant belong to opposing political affiliations; (2) the defendant has knowledge of the plaintiff's affiliation; (3) a challenged employment action occurred; and (4) political affiliation was a substantial or motivating factor behind it." *Martín-Vélez v. Rey-Hernández*, 506 F.3d 32, 39 (1st Cir. 2007) (citations and quotation marks omitted).

Here, only one Plaintiff alleges discrimination based on his change of political affiliation. Specifically, Rosario-Ramos, a truck driver for the Municipality, alleges he was subjected to political discrimination after he published a post on Facebook supporting the incumbent Mayor's political rival, David Acosta. The post stated the following: "Populares de Río Grande with David Acosta" (which translates to "Popular Party Members with David Acosta").[5] While David Acosta was the mayoral candidate for the New Progressive Party, the Mayor belonged to the Popular Democratic Party. *See* DSUMF ¶¶ 192-201. As such, Rosario-Ramos contends that, following the post, (1) he was stripped of his functions because he was given an OP-13 Form[6] the day after the publication, and (2) he was discriminated up until the nonrenewal of his contract in January 2017. *See* Docket No. 33 at

---

[5] As will be discussed in the next section, Rosario-Méndez and Torrens-Osorio only alleged a free speech retaliation claim.

[6] The Form, which was handed to him by Caraballo-Rodríguez, forces Rosario-Ramos to use his accumulated compensatory time. *See generally* DSUMF ¶¶ 206-24.

2-3. He further alleges that, because his post was public, Defendants knew about his statements in support of the Mayor's political contender. *Id.*

After reviewing the record, the Court concludes that Rosario-Ramos has failed to present evidence for a reasonable juror to conclude (1) that Defendants had knowledge of the post (and of Rosario-Ramos's change of political affiliation for that matter) at all pertinent times, and (2) that Rosario-Ramos's public support for David Acosta was the "but-for cause" for the challenged employment actions.[7] *See Nieves v. Bartlett*, 139 S.Ct. 1715, 1722 (2019) (citations omitted).

**A. Rosario-Ramos Failed to Show that Defendants Knew of his Political Affiliation**

To satisfy the second part of the *prima facie* discrimination test, Rosario-Ramos needed to "point" to sufficient evidence suggesting that Defendants *knew* about his change of political affiliation at the time of the alleged adverse employment actions. *LaRou v. Ridlon*, 98 F.3d 659, 661 (1st Cir. 1996) (citation omitted); *Peguero-Moronta v. Santiago*, 464 F.3d 29, 48 (1st Cir. 2006). This Court has previously held that statements of political patronage by themselves, as well as being seen supporting a particular candidate in a political activity or having political propaganda on one's house or car, do not automatically satisfy the *prima facie* test for political discrimination. *Morales-Torrens v. Consorcio del Noroeste*, 767 F. Supp. 2d 287, 294 (D.P.R. 2010) (citing *Roman v. Delgado Altieri*, 390 F. Supp. 2d 94, 103 (D.P.R. 2005)); *see also González–Pina v. Rodríguez*, 407 F.3d 425, 432 (1st Cir. 2005) ("[S]upport for a rival mayoral candidate in the primary, even if the Mayor was aware of such support, is by itself insufficient to establish political animus.") (citation omitted). Furthermore, a single "assertion about statements of political affiliation—unaccompanied by any specific factual information to support a

---

[7] The Court finds that prongs one and three of the *prima facie* case have been satisfied. Thus, such prongs will not be discussed in detail.

claim, and unrelated to any employment action . . . is patently insufficient to establish an act of political discrimination." *López-Carrasquillo v. Rubianes*, 230 F.3d 409, 414 (1st Cir. 2000).

Here, while the Facebook post expressed support for the Mayor's political rival, Rosario-Ramos has failed to establish that Defendants knew about the post or his change in political affiliation. In his deposition, Rosario-Ramos admitted that, during his employment, he was publicly known as a supporter of the Mayor and the Mayor's political party. Docket No 53-3 at 99. Thus, except for the post, the record contains no evidence to suggest that Defendants had any reason to believe Rosario-Ramos to be a supporter of the opposing party. Moreover, Rosario-Ramos admitted not knowing whether Defendants saw the post. Docket No 53-3 at 100; DSUMF ¶¶ 192-201; ¶ 224. He further testified that his supervisor, Caraballo-Rodríguez—who asked him to sign the OP-13 Form the day after the post—was not his friend in Facebook. Docket No. 53-3 at 103. In addition, two coworkers testified not knowing about the Facebook post or Rosario-Ramos's change in political affiliation. *See* Docket Nos. 53-5 at 7-9; 53-6 at 17-18, 20. As such, the only factual allegation put forth by Rosario-Ramos to show knowledge is simply that Facebook typically notifies your network—i.e., your Facebook friends—when you publish a post. Docket No. 53-3 at 100, 103.[8] This sort of speculation is not enough to satisfy the second prong of the test; nor does it imply that Defendants' knew of Rosario-Ramos's political affiliation.

B. **Rosario-Ramos Failed to Establish Nexus Between his Post and the Challenged Conduct**

Moreover, Rosario-Ramos also failed to meet the fourth prong of the political discrimination test, regarding causal nexus. The record contains little or no evidence that would suggest, let alone

---

[8] The fact that Facebook is a social media website does not *by itself* compel this Court to conclude that the contents of the post are public knowledge. In other words, from the evidentiary record presented, it does not automatically follow that Defendants—who were generally not part of Rosario-Ramos's Facebook network—knew about Rosario-Ramos's post simply because of Facebook's "public square" status. *See Packingham v. North Carolina*, 137 S.Ct. 1730, 1732 (2017) (describing social media, *inter alia*, as the "modern public square" for purposes of the First Amendment).

establish by a preponderance of the evidence, that the Facebook post was a substantial or motivating factor for Defendants' decision to hand Rosario-Ramos the OP-13 Form[9] or for eventually not renewing his contract. Instead, Rosario-Ramos's contentions are based on hearsay statements and conclusory remarks, whereby he alleges that other municipal employees—Luis Acevedo and Alberto Morales—told him that the employment decisions stated above "came from the Mayor," and that he "[could not] do anything" because he was "carrying on a war on Facebook against the mayor." *See* Docket No. 53-3 at 85-87; DSUMF ¶ 224. Rosario-Ramos even admitted having "no personal knowledge" that the Mayor or Caraballo-Rodríguez ordered any challenged employment action or, again, that any Defendant saw his post. Docket No. 53-3 at 87, 100; DSUMF ¶¶ 195, 224.

As courts have recognized, "simply [] asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by political animus" does not satisfy the *prima facie* fact-specific showing that a plaintiff was victim of political discrimination. *See Cruz-Baez v. Negrón-Irizarry*, 360 F. Supp. 2d 326, 339 (D.P.R. 2005) (citing *Avilés–Martinez v. Monroig*, 963 F.2d 2, 5 (1st Cir. 1992); and *Mt. Healthy City Sch. Dist. Bd. v. Doyle*, 429 U.S. 274, 287 (1977)). The statements allegedly made by Rosario-Ramos's colleagues—none of which are in decision-making positions—do not establish a politically discriminatory motivation for any of the challenged employment actions. The Court cannot conclude otherwise simply because Rosario-Ramos was instructed to sign the OP-13 Form the day *after* his Facebook post. *See Trainor v. HEI Hospitality*, LLC, 699 F.3d 19, 28 (1st Cir. 2012) (treating "temporal proximity" between adverse employment actions and protected conduct as just one factor, that must be reinforced by other evidence).[10]

---

[9] *Supra* footnote 6.

[10] In this sense, it is worth adding that the burden of proving discriminatory motivation in this scenario "is more substantial than the burden of producing prima facie evidence in, for example, the first stage of a Title VII discrimination case." *Diaz-Bigio v. Santini*, 652 F.3d 45, 56 (1st Cir. 2011) (citations omitted).

Perhaps most importantly, the record indicates that on September 22, 2016—four days before the OP-13 Form was tendered—Rosario-Ramos was involved in a physical altercation with Caraballo-Rodríguez, because of job-related discrepancies. DSUMF ¶¶ 342-53. As a result, Caraballo-Rodríguez filed a report of simple aggression with the police. *Id.* This event alone could have reasonably prompted the OP-13 Form.[11] Similarly, Rosario-Ramos claims he suffered political discrimination due to his Facebook post, yet his contract was renewed at least twice after the publication and it was not until the end of January 2017—four months after—that his contract was not renewed. *Id.* at ¶ 236. In addition, the record shows that Rosario-Ramos had attendance issues dating back to months before his Facebook post and he admitted having been warned about such issues months prior to the post. *Id.* at ¶¶ 231-33. These findings strengthen the Court's conclusion that Rosario-Ramos failed to show, by a preponderance of the evidence, that his political affiliation was the substantial or motivating factor behind any of the alleged discriminatory actions.

### III. Free Speech Retaliation

"To establish free-speech retaliation, a plaintiff . . . must show that he spoke as a citizen on a matter of public concern, that his interest in speaking outweighed the government's interest, as his employer, in promoting the efficiency of the public services it provides . . . and that his speech was a substantial or motivating factor [for the adverse employment action]." *Rodríguez v. Municipality of San Juan*, 659 F.3d 168, 180 (1st Cir. 2011) (citations and quotation marks omitted). For the speech to be protected, the employee must speak as a concerned citizen, not as an employee. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *see also Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). If the employee's

---

[11] In other factual circumstances, it has been determined that the Fair Labor Standards Act ("FLSA") does not prohibit an employer from compelling an employee to utilize his compensatory leave. *See Christensen v. Harris County*, 529 U.S. 576, 585 (2000) ("[FLSA] says nothing about restricting an employer's efforts to *require* employees to use compensatory time. Our interpretation . . . finds support in two other features of the FLSA . . . .").

speech was made "pursuant to" his official duties or if the government's interests in functioning efficiently outweigh the First Amendment interests, then the first and second prongs, respectively, are not satisfied. *Id.* Meanwhile, to satisfy the third prong, plaintiff must show a causal connection between the allegedly protected speech and the retaliatory response. *Goldstein v. Galvin*, 719 F.3d 16, 30 (1st Cir. 2013) (citation omitted).

Here, both Rosario-Ramos and Rosario-Méndez claim free speech retaliation. While the former alleges retaliation due to his Facebook post, Rosario-Méndez alleges that she was demoted and stripped away of her duties as a Purchaser because she disclosed "the truth about the illegal use of public funds" to José "Cheo" Cruz ("Cheo")—a reporter who later divulged the information.[12] Docket No. 33 at 4-5. For purposes of the free speech retaliation test, the Court will assume without deciding that both Rosario-Ramos and Rosario-Méndez spoke as private citizens on matters of public concern. Nonetheless, the Court concludes that Plaintiffs fail to satisfy the rest of the test.

### A. Rosario-Méndez Failed to Show that her Interest Outweighed that of the Municipality

The second prong of the free speech retaliation test requires the Court to balance certain interests. In this sense, "government interests outweigh First Amendment rights when employee speech prevents efficient provision of government services or disrupts the workplace." *Torres-Rosado v. Rotger-Sabat*, 335 F.3d 1, 13 (1st Cir. 2003) (citations omitted). "In performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Ranking v. McPherson*, 483 U.S. 378, 388 (1987). As such, courts must analyze "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which

---

[12] It is worth noting that the publications made by Cheo specifically referenced two purchase transactions made by Rosario-Méndez. DSUMF ¶¶ 46-55. In addition, Rosario-Méndez herself admitted disclosing the transactions to Cheo for him to investigate them. *Id.* at ¶¶ 100-110.

personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* (citing *Pickering,* 391 U.S. at 570–73).

Contrary to her claims, the record demonstrates that: (1) Rosario-Méndez's expressions to Cheo were made in a reckless and speculative manner; (2) the expressions posed a substantial risk of impairing the Municipality's provision of services; and (3) the Municipality had a legitimate interest in investigating the disclosures to guarantee the efficiency of its processes and the integrity of its relations.[13] As such, the Court concludes that the Municipality's interest in functioning efficiently was greater than Rosario-Méndez's interest in expressing herself. *See Hennessy v. City of Melrose,* 194 F.3d 237, 248 (1st Cir. 1999) (determining that a City's "robust interest in implementing the curriculum without undue interference easily outweighs the [plaintiff's] interest in [publicly criticizing the curriculum] at the time and manner that he chose.").

Rosario-Méndez first contacted Cheo regarding a purchase order, believing that it illegally authorized the acquisition of materials for the rehabilitation of a private home. Docket No. 53-2 at 59-60. However, she later learned she was mistaken because the materials were destined to the rehabilitation of a school, which was previously donated through a valid municipal resolution to a private individual. *Id.* Furthermore, the rehabilitation of the school was done in order to prepare the building for upcoming political primaries. *Id.* at 70. She also incorrectly assumed that the school was registered as a private, for profit institution because it had the name of "Colegio Abriendo Surcos." *Id.* at 60-61. Such admissions, *inter alia*, demonstrate that Rosario-Méndez had no reasonable basis to

---

[13] While the Court will not go as far as to rule on whether Rosario-Méndez's communications—or Cheo's, for that matter—amount to false information or defamation, it will highlight the fact that Defendants posed this question in their Motion for Summary Judgment. Docket No. 53 at 16. For more on defamation, *see Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339-40 (1974) (noting that the First Amendment protects false ideas but holds no value for false statements of facts).

believe that the purchase order was illicit when she decided to disclose the information to Cheo. *Id*. at 62, 71; *see id.* at 61, 67, 74-77.

In the second set of disclosures made to Cheo, Rosario-Méndez incorrectly alleged that the Municipality had processed a purchase order to acquire a replacement tire for a truck owned by a private individual, a municipal employee. Docket 53-2 at 74. However, when the tire blew, the truck had been lent to the Municipality to assist in a public works project—specifically, in the rehabilitation of the private school. *See* Docket No. 53-2 at 74. Rosario-Méndez also admitted having no personal knowledge as to whether the Municipality actually paid for the tire. *See* DSUMF ¶¶ 77-107. Again, Rosario-Méndez's deposition testimony shows that she had no reasonable basis to believe that an illegality was taking place so as to justify her disclosures to Cheo. *See* Docket 53-2 at 77-80; DSUMF ¶¶ 77-107.

These facts underscore the speculative nature of the disclosures and the reckless manner in which they were made to a reporter, without Rosario-Méndez first verifying the accuracy of her allegations or reporting the matter to a supervisor. Instead, Rosario-Méndez went on to question her supervisor, Adorno-Aponte, about the transactions in a way that could jeopardize the efficiency and integrity of certain municipal services.[14] *See* DSUMF ¶¶ 84-89; Docket No. 53-2 at 62, 71. On this note, "[t]he First Amendment notwithstanding, a supervisor is entitled to a modicum of respect and decorum in work-related situations." *Hennessy v. City of Melrose*, 194 F.3d 237, 248 (1st Cir. 1999). As a result, on September 2016—*before* learning that it was Rosario-Méndez who made the disclosures to

---

[14] Note the distinction between the type of disclosures and expressions in this case *vis-a-vis* the statements at issue in *Torres-Rosado v. Rotger-Sabat*, 335 F.3d 1 (1st Cir. 2003). In that case, the First Circuit determined that the plaintiff's First Amendment interests outweighed Defendants', particularly because "plaintiff wrote a *private* memo which she worded *fairly diplomatically*; it is difficult to think of a less disruptive manner in which plaintiff might have communicated." *Id.* at 13 (emphasis added). Here, the Court cannot say the same about Rosario-Méndez's statements and the manner in which they were offered.

Cheo—Adorno-Aponte retained Rosario-Méndez's order logbook[15] until the Municipality could ascertain the source of the published leaks. DSUMF ¶ 49. Subsequently, Rosario-Méndez stopped handling the purchases or requisitions until January 2017. *See id.* at ¶¶ 46-55. However, at that moment, Adorno-Aponte merely knew about Cheo's publications accusing the Municipality of illegal purchases, not the identity of the source of the leak. *Id.*

As mentioned, the balancing of interests requires this Court to consider the manner, time, and place of the expressions, and "requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Connick v. Myers*, 461 U.S. 138, 151-52 (1983) (citing *Ex parte Curtis*, 106 U.S. 371, 373 (1882)). Here, the Court finds that Rosario-Méndez's speculative disclosures and statements carried a substantial risk of disruption to the Municipality's purchase department. *See Curran v. Cousins*, 509 F.3d 36, 49 (1st Cir. 2007) (determining that a "substantial risk of disruption to the department" may be apparent from the "text of the speech and the escalation of [plaintiff's] speech.") (citations omitted). Thus, it logically followed that the Municipality would take appropriate measures—such as retaining the order logbook—to prevent any future disruption of its services and investigate the leaks as well as the corruption allegations. *Id.* ("Significant weight is given to the public employer's reasonable predictions of disruption, even when the speech involved is on a matter of public concern.") (quotation marks and citation omitted).

The foregoing is particularly true not only because of the content and nature of the expressions themselves, but because the disclosures were made to a reporter and it was reasonable to assume that he would publish the information as conveyed to him. In this sense, the disclosures

---

[15] The order logbook is a "book where all orders that have been placed are entered into, to maintain an altogether record at hand of processed orders in case any municipal office called to inquire information regarding the status of a requisition". DSUMF ¶ 18. Rosario-Méndez admitted that the logbook was not the basis of her functions. *Id.* at ¶ 52. After the logbook was retrieved, none of her office equipment or office space was taken away. *Id.* at ¶ 56.

risked causing—and indeed caused—"a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, [] impede[d] the performance of the speaker's duties [and] interfere[d] with the regular operation of the enterprise." *Ranking*, 483 U.S. at 388 (citation omitted). Moreover, the record shows that the actions taken by Adorno-Aponte after noticing Cheo's publications—that is, to retain the order logbook, and temporarily halting Rosario-Méndez's handling of purchases—were objectively reasonable.

As such, and in light of *Pickering* and its progeny, the Court reiterates that speculative remarks done with no reasonable basis risk disrupting work relations and undermining the operations of an entire department—particularly when such a department is composed of only two employees. DSUMF ¶¶ 7-13; *see Waters v. Churchill*, 511 U.S. 661, 680 (1994) (admonishing that the balance must take into account the employer's strong interest in avoiding friction in the workplace). While the Court sees no reason to doubt Rosario-Méndez's sense of responsibility and commitment to denouncing corruption, the record leaves no room to conclude that a reasonable juror would find that her interest in disclosure outweighed the Municipality's interest in the efficient administration of its services. Less so when the Municipality—as an employer—had a legitimate interest in investigating the disclosures to guarantee transparency, efficiency, the correctness of the information, and the continuation of public services. DSUMF ¶ 49; *see* Docket Nos. 53-13 and 54-14.[16]

## B. Rosario-Méndez Failed to Establish Nexus Between her Statements and the Challenged Conduct

In any case, Rosario-Méndez failed to proffer evidence to show causation between her statements and Defendants' conduct. To evaluate whether a causal nexus exists, Plaintiffs must

---

[16] *See also Connick*, 461 U.S. at 147 ("So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively.").

adduce "proof of a causal connection between the allegedly protected speech and the allegedly retaliatory response." *Goldstein v. Galvin*, 719 F.3d 16, 30 (1st Cir. 2013) (citation omitted). As such,

> It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.

*Nieves*, 139 S.Ct. at 1722 (citation omitted). Yet, "the mere fact that an adverse action was taken after an employee exercises First Amendment rights is not enough by itself to establish a prima facie case." *Acosta–Orozco v. Rodríguez de Rivera*, 132 F.3d 97, 101 (1st Cir. 1997).

The record is devoid of evidence as to whether Adorno-Aponte—or any other superior—knew about Rosario-Méndez's disclosures before the challenged employment actions took place. To the contrary, Rosario-Méndez testified that it was sometime between October and November 2016 when Martha Negrón—the other Purchaser for the Municipality—allegedly told Adorno-Aponte about Rosario-Méndez' statements to Cheo. Docket No. 53-2 at 110-13. However, the challenged employment action against Rosario-Méndez began earlier that year, in September. *Id.* In fact, Rosario-Méndez testified that the only reason for her to believe that her duties were stripped as a result of her communications with Cheo is that a coworker told her that Martha Negrón had told the Municipality that Rosario-Méndez disclosed the information. Docket 53-2 at 115-16. This hearsay within hearsay is insufficient to show causation.

Rosario-Méndez also claims that the Municipality's failure to renew her contract in October 2017, after Hurricane Maria, was retaliation for her communications with Cheo, even though this non-renewal occurred *one year after* her disclosures to Cheo. The record, however, shows that her contract was renewed several times after her disclosures. DSUMF ¶¶ 4, 164-72. It also shows that before the disclosures, Rosario-Méndez was repeatedly warned of her attendance issues. *Id.* at ¶¶ 29-

40. She even admitted that she would oftentimes fail to timely inform her supervisor of her tardiness or absence. *Id.* In fact, Rosario-Méndez and other coworkers were even summoned to the Human Resources Office and notified by letter about their attendance issues. *Id.* at ¶¶ 30; 37. Yet, after Hurricane Maria, she failed to report to work as instructed for approximately three weeks and failed to sign the attendance sheet as instructed. *Id.* at ¶¶ 150-51, 154-55, 158-63. These findings further strengthen the fact that there is no "but-for" causality between her expressions and the non-renewal of her contract. *See Nieves*, 139 S.Ct at 1722 (citations omitted).

### C. Rosario-Ramos Again Failed to Establish Causal Nexus

As to Rosario-Ramos, the statements in his Facebook post supporting a political candidate, made approximately two months before an election, certainly constituted the type of individual speech that is of the upmost public importance in our democratic society. *See, e.g., Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 333-35 (2010). Hence, his interest in expressing support for a political candidate clearly outweighs whatever hindrance such post could cause the Municipality or his Mayor. This is especially true when nothing in the record sheds light as to how such a post would disrupt the Municipality's provision of services.

Nevertheless, Rosario-Ramos failed to proffer enough evidence to conclude that there exists causation between his political statement—the Facebook post—and Defendants' supposed retaliatory actions. As explained above, *supra* section II.A, the record does not contain evidence that Rosario-Ramos's supervisors were aware of his Facebook post or that any Defendant ordered the challenged employment actions. Furthermore, as also stated above, *supra* section II.A, Rosario-Ramos had been involved in a workplace altercation with a supervisor before the challenged actions took place. This event alone would provide a legitimate explanation for the employer's conduct. *Supra*

section II.A. Thus, no reasonable juror could conclude that the post was the motivating factor or the "but-for" cause for the conduct taken against him. *See Nieves*, 139 S.Ct at 1722 (citations omitted).

    D.  Torrens-Osorio did not Make any Protected Expressions

Finally, as to Torrens-Osorio—the truck driver who claims First Amendment retaliation due to his wife's communications with Cheo—, his allegations do not support a cause of action under the First Amendment because nothing in the record shows that he made any statements himself on matters of public concern. Hence, he automatically fails to meet the first prong of the retaliation test: that plaintiff engaged in a constitutionally protected activity related to a form of public concern speech. *Davignon v. Hodgson*, 524 F.3d 91, 100 (1st Cir. 2008) (citing *Ranking*, 483 U.S. at 384) ("As a threshold matter, we must determine whether the employee spoke as a citizen on a matter of public concern."). Only by satisfying this prong could the Court proceed to consider prongs two and three.

As such, Plaintiffs failed to show (1) that a *prima facie* case of First Amendment violations has been established as to any Defendant, or (2) that each individual Defendants' conduct constitutes a deprivation of Plaintiffs' rights. From the facts and evidence presented, no reasonable juror could reasonably infer otherwise. The Court thus must **DISMISS ALL FIRST AMENDMENT CLAIMS WITH PREJUDICE.**

    IV.    Qualified Immunity and Municipal Liability

Assuming *arguendo* that Plaintiffs could have successfully established a *prima facie* case of First Amendment discrimination or retaliation, Defendants—in their individual capacity—would still be entitled to qualified immunity. "[T]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Guillemard-Ginorio v. Contera-Gomez*, 585 F.3d 508, 526 (1st Cir. 2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

To bypass such immunity, Plaintiffs had to "point to controlling authority or a body of persuasive authority, existing at the time of the incident, that can be said to have provided the defendant with 'fair warning'" of the illegality of their actions or inactions. *Decotiis v. Whittemore*, 635 F.3d 22, 37 (1st Cir. 2011) (citing *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). They did not do so. Moreover, from the record presented, as well as the set of facts discussed, it is "far from clear if Defendants' actions were sufficiently oppressive to chill the speech of a reasonable hardy individual," or if Defendants had "fair warning" that their particular conduct was unconstitutional. *Barton v. Clancy*, 632 F.3d 9, 30 (1st Cir. 2011). The Court cannot simply assume that each Defendant knew or should have known that their actions constituted a constitutional violation, especially since Plaintiffs have failed to show they did in fact suffer a constitutional deprivation of rights.

On the other hand, in *Monell v. Dep't of Soc. Servs. of City of N.Y.*, the Supreme Court held that municipalities could be held liable for violations of § 1983, but not on the basis of *respondeat superior*. 436 U.S. 658, 691 (1978). Rather, municipal liability must be based on the enforcement of an "official policy" that serves as the "moving force of the constitutional violation." *Id.* at 694-95; *Haley v. City of Bos.*, 657 F.3d 39, 51 (1st Cir. 2011) ("[A] plaintiff who brings a section 1983 action against a municipality bears the burden of showing that, through its deliberate conduct, the municipality was the moving force behind the injury alleged.") (quotation marks and citation omitted). Therefore, "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (citation omitted). Here, the record is devoid of evidence that the Mayor was personally involved in the decision-making behind the challenged employment actions, that he either sanctioned or ordered other officials to carry out the challenged conduct, or that such actions

were part of a customary practice commonly accepted by him. Plaintiffs instead relied on hearsay evidence about isolated remarks from co-workers, to allege that the Mayor knew about or was behind the challenged conduct.[17] Thus, the Court cannot conclude that the Municipality is liable.

V.      **State Law Tort Claims**

Plaintiffs' remaining claims are grounded on Puerto Rico law. Generally, district courts should decline to exercise supplemental jurisdiction over a plaintiff's state law claims when all federal claims are dismissed. *Camelio v. Am. Fed.*, 137 F.3d 666, 672 (1st Cir. 1998) ("the balance of competing factors ordinarily will weigh strongly in favor of declining jurisdiction over state law claims where the foundational federal claims have been dismissed at an early stage in the litigation."). Because the Court dismisses Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction and **DISMISSES WITHOUT PREJUDICE** any claims made under Puerto Rico law.

## CONCLUSION

This Court hereby **GRANTS** Defendants' Motion for Summary Judgment. Docket No. 53. Accordingly, Plaintiffs' federal claims for discrimination and retaliation are **DISMISSED WITH PREJUDICE**, and the claims pursuant to Puerto Rico law are hereby **DISMISSED WITHOUT PREJUDICE**. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, March 11, 2021.

**S/ JAY A. GARCIA-GREGORY**
JAY A. GARCIA-GREGORY
SENIOR U.S. DISTRICT JUDGE

---

[17] For example, Plaintiffs themselves testified that they were told certain actions were carried out "by order of the Mayor," or by "instructions of the mayor." *See* DSUMF ¶¶ 32, 173-76; Docket No. 53-2 at 67. These few self-serving remarks do not compel the Court to change today's decision. Likewise, there are facts and testimony suggesting the Mayor (1) was either unaware of the alleged retaliatory conduct or (2) did not typically interact with Plaintiffs, and (3) gave no direct instructions regarding how to proceed with Plaintiffs. *See, e.g.*, DSUMF ¶¶ 92-93, 173-76, 195-96, 224, 326-29, 332, 338, 339.